1  Joseph Choate, Jr.,   39018
   Robert P. Lewis, Jr.   57624
2  Bradley L. Cornell,   162384
   Choate & Choate
3  2596 Mission Street
   Suite 300
4  San Marino, CA 91108-1679

5  Tel. 213-623-2297
   Fax: 213-623-6429
6
   Attorneys for Defendant
7  River Ranch Fresh Foods, LLC

8

9              UNITED STATES DISTRICT COURT

10     NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

11
   NATURAL SELECTION FOODS, LLC  )
12 dba EARTHBOUND FARMS,         )   Case No.  C07 02548 HRL
                                 )
13              Plaintiff,       )   ANSWER OF
                                 )   RIVER RANCH FRESH FOODS, LLC
14      vs.                      )   and COUNTERCLAIM
                                 )
15                               )   COUNTERCLAIM FOR:
                                 )
16 RIVER RANCH FRESH FOODS, LLC, )   1. BREACH OF CONTRACT
                                 )   2. NEGLIGENCE
17              Defendant.       )   3. NEGLIGENT INTERFERENCE WITH
                                 )      PROSPECTIVE ECONOMIC
18                               )      ADVANTAGE
                                 )
19 _____)   DEMAND FOR JURY TRIAL

20

21      Defendant RIVER RANCH FRESH FOODS, LLC., ("RIVER RANCH")

22 answers the complaint of plaintiff, NATURAL SELECTION FOODS,

23 LLC., dba EARTHBOUND FARMS ("NATURAL SELECTION") as follows:

24      1.  RIVER RANCH admits the allegations of paragraph 1 of the

25 complaint.

26      2.  RIVER RANCH admits the allegations of paragraph 2 of the

27 complaint.

28      3.  RIVER RANCH  admits  the allegations  of  paragraph 3  of
   the complaint.

                              1

**ANSWER TO JURISDICTION AND VENUE ALLEGATIONS**

4. RIVER RANCH admits the allegations of paragraph 4 of the complaint.

5. RIVER RANCH admits the allegations of paragraph 5 of the complaint.

**ANSWER TO BACKGROUND FACTS**

6. RIVER RANCH admits the allegations of paragraph 6 of the complaint.

7. RIVER RANCH admits the allegations of paragraph 7 of the complaint.

8. RIVER RANCH admits the allegations of paragraph 8 of the complaint.

9. RIVER RANCH admits the allegations of paragraph 9 of the complaint.

10. RIVER RANCH has insufficient knowledge to enable it to answer the allegations of this paragraph and basing its answer thereon, denies the allegations of paragraph 10 of the complaint.

11. RIVER RANCH admits that it received a credit for certain of the produce in question, and except as otherwise admitted, denies the allegations of paragraph 11 of the complaint.

12. RIVER RANCH denies the allegations of paragraph 12 of the complaint.

13. RIVER RANCH has insufficient knowledge to enable it to answer the allegations of this paragraph and basing its answer thereon, denies the allegations of paragraph 13 of the complaint.

2

14.   RIVER RANCH has insufficient knowledge to enable it to answer the allegations of this paragraph and basing its answer thereon, denies the allegations of paragraph 14  of the complaint.

15. RIVER RANCH denies the allegations of paragraph 15 of the complaint.

## ANSWER TO COUNT I – DECLARATORY RELIEF
## – VALIDATING PACA TRUST CLAIM

16.   RIVER RANCH incorporates its answers to paragraphs 1 through 15 of the complaint.

17.   RIVER RANCH denies the allegations of paragraph 17 of the complaint.

18. RIVER RANCH admits the allegations of paragraph 18 of the  complaint.

19. RIVER RANCH denies the allegations of paragraph 19 of the complaint.

20. RIVER RANCH alleges that  the allegations of paragraph 20 of the  complaint speak for themselves.

## ANSWER TO COUNT II – ENFORCEMENT OF PAYMENT FROM PACA TRUST ASSETS

21.   RIVER RANCH incorporates its answers to paragraphs 1 through 20 of the complaint.

22. RIVER RANCH denies the allegations of paragraph 22 of the complaint.

23. RIVER RANCH denies the allegations of paragraph 23 of the complaint.

24. RIVER RANCH denies the allegations of paragraph 24 of the complaint.

3

25. RIVER RANCH alleges that the allegations of paragraph 25 of the complaint speak for themselves.

**ANSWER TO COUNT III – VIOLATION OF THE PACA: FAILURE TO MAINTAIN PACA TRUST ASSETS AND CREATION OF COMMON FUND**

26. RIVER RANCH incorporates its answers to paragraphs 1 through 25 of the complaint.

27. RIVER RANCH admits the allegations of paragraph 27 of the complaint.

28. RIVER RANCH denies the allegations of paragraph 28 of the complaint.

29. RIVER RANCH admits the allegations of paragraph 29 of the complaint.

30. RIVER RANCH denies the allegations of paragraph 30 of the complaint.

31. RIVER RANCH denies the allegations of paragraph 31 of the complaint.

32. RIVER RANCH alleges that the allegations of paragraph 32 of the complaint speak for themselves.

**ANSWER TO COUNT IV – VIOLATION OF PACA: FAILURE TO PAY PROMPTLY**

33. RIVER RANCH incorporates its answers to paragraphs 1 through 32 of the complaint.

34. RIVER RANCH admits the allegations of paragraph 34 of the complaint.

35. In answer to the allegations of paragraph 35 of the complaint, RIVER RANCH alleges that provisions of the referenced CFR speak for themselves.

36. RIVER RANCH denies the allegations of paragraph 36 of the complaint.

4

37.   RIVER RANCH denies the allegations of paragraph 37 of the complaint.

38. RIVER RANCH alleges that  the allegations of paragraph 38 of the  complaint speak for themselves.

### ANSWER TO COUNT V - BREACH OF CONTRACT

39.   RIVER RANCH incorporates its answers to paragraphs 1 through 38 of the complaint.

40.   RIVER RANCH admits the allegations of paragraph 40 of the   complaint.

41. RIVER RANCH denies  the allegations of paragraph 41 of the complaint.

42.   RIVER RANCH denies the allegations of paragraph 42 of the complaint.

43.  RIVER RANCH alleges that  the allegations of paragraph 43 of the  complaint speak for themselves.

### AS FOR AFFIRMATIVE DEFENSES, DEFENDANT ALLEGES AS FOLLOWS:

### First Affirmative Defense

(Offset)

44.   RIVER RANCH alleges that it has suffered damage by reason of NATURAL SELECTIONS's conduct and, therefore, has the right to offset any amount of money that it is owed to or due to NATURAL SELECTION by way of damage.

### Second Affirmative Defense

(Breach of Contract)

45.   RIVER RANCH is informed and believes, and on such information and belief alleges that NATURAL SELECTION breached its contract with RIVER RANCH and that by reason of said breach, RIVER RANCH has been excused of any duties to perform obligations

5

set forth in the contract, including but not limited to the payment of any additional monies claimed by NATURAL SELECTION.

### Third Affirmative Defense

(Breach of Implied and Express Warranties of Merchantability)

46. NATURAL SELECTION breached its implied and express warranties of merchantability by failing to produce  of a merchantable quality.

### Fourth Affirmative Defense

(Breach of Warranty of Fitness for a Particular Purpose)

47. NATURAL SELECTION breached its implied and express warranties of fitness for a particular purpose when it shipped and sent contaminated produce out into the stream of commerce.

**WHEREFORE,** RIVER RANCH prays that:

1. NATURAL SELECTION take nothing by its complaint and each claim for relief contained therein;

2. That judgment be entered against NATURAL SELECTION and in favor of RIVER RANCH on the complaint  and each and every cause of action contained therein;

3. That RIVER RANCH be awarded its  attorney's fees and costs  of suit incurred in the defense of this complaint;

4. For such other further relief, as the Court may deem proper.

## COUNTERCLAIM

48. Defendant and Counterclaimant RIVER RANCH counterclaims against Plaintiff and Counterdefendant NATURAL SELECTION as follows:

### ALLEGATIONS    COMMON    TO    ALL    COUNTERCLAIMS

6

49.   The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, 7 U.S.C. § 499e(b),  and 7 U.S.C. §499e(c)(4). Additionally, the PACA being one regulating commerce, this Court has jurisdiction under 28 U.S.C. § 1337.

50.   This court has supplemental jurisdiction over any state claims pursuant to 28 U.S.C. § 1367.

51.   Venue in this District is based on 28 U.S.C. § 1391 in that (a) RIVER RANCH's claims arose in this District and (b) the Counter defendant NATURAL SELECTION maintain places of business in this District.

52.   RIVER RANCH is engaged in the business of selling wholesale quantities of fresh fruit and vegetables in interstate commerce with its principal place of business in Salinas, California, and was duly licensed pursuant to the PACA.

53.   NATURAL SELECTION is licensed under Section 3 of the PACA, 7 U.S.C. § 499c, that has operated as a dealer in perishable commodities within the meaning of Section 1(6) of the PACA, 7 U.S.C. § 499a(6), and is engaged in the business of growing, harvesting, processing and selling wholesale quantities of fresh fruit and vegetables in interstate commerce with its principal place of business at San Juan Bautista, California.

54.   For a number of years prior to 15 September 2006, NATURAL SELECTION sold and delivered to RIVER RANCH fresh produce consisting of prepackaged blends of various types of salad greens including spinach commonly known as "Spring Mix."

55.   The aforesaid sales were made pursuant to the terms of a Master Crop Agreement ("Agreement") dated 14 April 2000 originally between RIVER RANCH and PRIDE OF SAN JUAN. Subsequently NATURAL SELECTION succeeded to PRIDE OF SAN JUAN's

7

interest in the Agreement and continued to operate and provide services and product to RIVER RANCH under its terms.

Paragraph 9 of the Agreement provided in pertinent part as follows:

> Grower further warrants that the entire Crop delivered to RRFF (River Ranch Fresh Farms) hereunder is guaranteed not to be adulterated within the meaning of the Federal Food, Drug and Cosmetic Act, as amended (21 U.S.C. Section 301, et seq.), or any other applicable law or regulation.

56. A copy of this Agreement is attached as **EXHIBIT A.**

57. On 13 September 2006, the Centers for Disease Control and Prevention ("CDC") alerted the U.S. Food and Drug Administration ("FDA") of a multi-state outbreak of _Escherichia coli_, ("E. coli"), that appeared to be associated with the consumption of bagged spinach.

58. On 14 September 2006, the FDA, San Francisco District Office together with other state and federal agencies commenced an investigation of NATURAL SELECTION's processing facilities. As a result of investigation, it was determined that NATURAL SELECTION was the processor which had processed the contaminated spinach products and sent it into the stream of interstate commerce. As of January 2006, two hundred and five confirmed illnesses and three deaths were attributed to the E. coli outbreak as a result of spinach processed by NATURAL SELECTION.

59. During the period from 1 April through 15 September 2006, NATURAL SELECTION did not hold a valid registration for the manufacture of processed foods with the California Department of

8

Health Services.

60.  As a result of its processing produce contaminated with E. coli, NATURAL SELECTION recalled a substantial number of the packages of the produce it had sold to  various customers including RIVER RANCH.

61.  As a result of the recall of the product by NATURAL SELECTION, RIVER RANCH lost both the profits on sales of the recalled produce but also future sales to its customers.

**FIRST COUNTERCLAIM - FOR BREACH OF CONTRACT**

62.  As part of its agreement with RIVER RANCH pertaining to the sale of the produce which is the subject of this counterclaim, NATURAL SELECTION specifically agreed to the terms, conditions, representations and warranties set forth in the document entitled River Ranch Fresh Foods, LLC - Supplier Checklist ("Checklist Agreement") executed on 22 February 2006.  Under the terms of which NATURAL SELECTION agreed to:

> indemnify, defend and hold harmless RIVER RANCH from and against any and all claims, liabilities, damages, losses, costs and expenses, including, without limitation costs and expenses of investigation and settlement and attorneys' fees and expenses, to the extent such claims are alleged to arise from: (i) any act or omission by supplier, or its agents and/or brokers, relating to or affecting the condition, quality, or character of any Product; (ii) Supplier's performance under this contractual agreement; or, (iii a breach by Suppliers of any of its representations, warranties, covenants or obligations under this contractual agreement.

A copy of this Checklist Agreement is attached as **EXHIBIT B.**

63.    Additionally NATURAL SELECTION failed to comply with the terms of the Checklist Agreement relating to its obligation to take steps to ensure that the ingredients it processed were "food safe."  Such failure resulted in the introduction of contaminated produce into the stream to interstate commerce, all to the damage of RIVER RANCH.

64.    The produce which NATURAL SELECTION processed and sold to its various customers is essentially fungible in that though it may be packaged differently, the contents of each package is essentially the same, i.e., a mixture various types of salad greens and spinach.

65.    By processing, packaging and selling produce contaminated with E. coli, NATURAL SELECTION breached it agreement with RIVER RANCH to process and deliver produce free from contamination.

66.    By virtue of NATURAL SELECTION's breach, RIVER RANCH has incurred losses on sales, and has been required to retain legal counsel and incur numerous costs, and RIVER RANCH is entitled indemnification from NATURAL SELECTION.  The extent of these costs is not presently known, but is believed to exceed $250,000.  RIVER RANCH will amend its complaint to set forth the amounts when finally ascertained.

### SECOND COUNTERCLAIM – FOR DAMAGES FOR NEGLIGENCE

67.    NATURAL SELECTION incorporates all of its prior allegations herein.

68.    At all times pertinent NATURAL SELECTION owed RIVER RANCH a duty to process its produce in such a manner as to insure that the produce it sold, not only to RIVER RANCH but to its other

10

1  customers, would not be contaminated, including contamination with
2  E. coli.

3      69. NATURAL SELECTION breached its duty to RIVER RANCH, as
4  well as its other customers by negligently failing to take
5  adequate steps to test for and eliminate contamination of the
6  produce it was processing and selling.

7      70. As a proximate cause of its negligence as set forth
8  above, NATURAL SELECTION processed, sold, and sent out into the
9  stream of interstate commerce produce that was contaminated with
10 E. coli, which resulting in a number of deaths and serious
11 illnesses and prompting a national scare.

12     71. As a proximate result of NATURAL SELECTION's negligence
13 as set forth above, RIVER RANCH lost not only the sales for the
14 produce it had purchased from NATURAL SELECTION during the period
15 from approximately 29 August through 15 September 2006, but also
16 future sales to its customers.

17     72. RIVER RANCH is informed and believes and thereon alleges
18 that NATURAL SELECTION's negligent conduct was so grevious that it
19 damaged the entire prepackaged salad industry.

20     73. RIVER RANCH has preliminarily estimated that its losses
21 exceed $250,000, and will amend its counterclaim to set forth the
22 exact amount when ascertained.

23     **THIRD COUNTERCLAIM – NEGLIGENT INTERFERENCE WITH PROSPECTIVE**
24                    **ECONOMIC ADVANTAGE**

25     74. NATURAL SELECTION incorporates all of its prior
26 allegations herein.

27     75. At all times mentioned, NATURAL SELECTION knew that the
28 produce which it processed and sold to RIVER RANCH would be

1   resold by RIVER RANCH to its own customers.

2       76.   NATURAL SELECTION knew or should have known that the

3   sale of contaminated produce by RIVER RANCH to its customers would

4   result in not only a loss of sales but a loss customer confidence,

5   its customer base, and injury to its industry reputation.

6       77.   By virtue of the foregoing, NATURAL SELECTION owed RIVER

7   RANCH a duty of care to see to it that it processed its produce in

8   such a manner as to ensure it would not be contaminated.

9       78.   NATURAL SELECTION breached its duty to RIVER RANCH by

10  negligently failing to take reasonable and necessary steps in the

11  processing of its produce to ensure it was not contaminated.

12      79.   As a direct and proximate cause of NATURAL SELECTION's

13  failure to properly process the produce, RIVER RANCH sustained

14  damage to is customer base, industry reputation and loss of sales

15  in an amount not yet determined but believed to be in excess  of

16  $250,000.

17

18  **WHEREFORE** Counterclaimant RIVER RANCH prays judgment against
    NATURAL SELECTION as follows:

19
    **AS TO FIRST COUNTERCLAIM**
20
        1.   For damages against NATURAL SELECTION in the principal
21
    amount of at least $250,000, subject to proof as to  the exact
22
    amount;
23
        2.   For reasonable attorney's fees and costs of suit incurred
24
    herein;
25
        3.   For all additional consequential and incidental damages
26
    subject to proof as to the exact amount; and,
27
        4.   For such other and further relief as the Court may deed
28
    just and proper.

## AS TO SECOND COUNTERCLAIM

1. For damages against NATURAL SELECTION in the principal amount of at least $250,000, subject to proof as to the exact amount;

2. For reasonable attorney's fees and costs of suit incurred herein;

3. For all additional consequential and incidental damages subject to proof as to the exact amount; and,

4. For such other and further relief as the Court may deed just and proper.

## AS TO THIRD COUNTERCLAIM

1. For damages against NATURAL SELECTION in the principal amount of at least $250,000, subject to proof as to the exact amount;

2. For reasonable attorney's fees and costs of suit incurred herein;

3. For all additional consequential and incidental damages subject to proof as to the exact amount; and,

4. For such other and further relief as the Court may deed just and proper.

DATED: 8 June 2007

CHOATE & CHOATE

Joseph Choate, Jr.
Counsel for Defendant and
Counterclaimant
River Ranch Fresh Foods

13

1

2

jc\files\riverr\answer.201#145

3

### PROOF OF SERVICE BY MAIL

4

5  STATE OF CALIFORNIA

6  COUNTY OF LOS ANGELES

7        I am employed in the county of Los Angeles, State of
California.

8        I am employed in the office of a member of the bar of this
court at whose direction the service was made.

9        I am over the age of 18 and not a party to the within
action; my business address is 2596 Mission Street, Suite 300,

10  San Marino, CA 91108-1679.

11        On the date set forth below  I served the following
document(s):

12

ANSWER OF RIVER RANCH FRESH FOODS, LLC., and COUNTERCLAIM

13

14  by placing a true copy thereof enclosed in a sealed envelope with
postage thereon fully prepaid in the United States mail at Los

15  Angeles, California, addressed as follows:

16  Lawrence H. Meuers, Esq.
Katy Koestner Esquivel, Esq.

17  Meuers Law Firm, P.L.
5395 Park Central Court

18  Naples, FL  34109-5932

19

20  Executed on 8 June 2007, at San Marino, California.

21  I declare under penalty of perjury under the laws of the State of
California that the above is true and correct.

22

23

24                          Glenellen Maxwell

25

26

27

28

14

**EXHIBIT A**

River Ranch Fresh Foods

Master No:10016
POSJ

# MASTER CROP AGREEMENT

**PREAMBLE**  This Master Crop Agreement ("Agreement") is entered into **April 14, 2000,** by and between **River Ranch Fresh Foods**, a California Corporation ("**RRFF**") and **Pride of San Juan** ("**Grower**") for the delivery and/or marketing of crop(s) ("Crop") to be grown by Grower for RRFF according to any Exhibits written and attached hereto as a part of this Agreement.  Grower and RRFF acknowledge that said Exhibits may be amended from time to time by mutual agreement of the parties.  This Agreement will remain in effect until any or all Exhibits have expired or terminated by mutual agreement of the parties.

**1. CROP OWNERSHIP**  In return for the consideration defined in Section 2, Grower agrees to grow exclusively for delivery to RRFF, and RRFF agrees to buy from Grower upon delivery, the percentage of the production in each field of the Crop ("RRFF's Crop") as designated in **Exhibit A(s)**.  In return for the consideration herein set forth in Section 3, RRFF agrees to market the percentage of the production in each field of the Crop  ("Grower's Crop") as designated in **Exhibit A(s)**.

At the time of harvest of the Crop under this Agreement, for the exclusive purpose of RRFF's selling of the Crop, full title to the Crop shall transfer to RRFF; in no event shall said transfer be construed as a transfer of beneficial interest therein according to the ownership interests of the parties in the Crop as stated in this Agreement.

**2. CONSIDERATION FOR RRFF'S CROP**  RRFF shall pay to Grower as the full and final price as specified in **Exhibit A(s)**. All of RRFF's Crop will be subject to grading and/or dockage according to the quality standards set forth in **Exhibit Q(s)**.  In the event that any of RRFF's Crop does not meet such quality standards, RRFF may, at its option, refuse to harvest and/or accept delivery of RRFF's crop.  Title to any of RRFF's Crop, which is rejected for failure to meet quality standards, shall thereupon vest in Grower, and RRFF need not pay Grower therefore.  Payment for RRFF's Crop accepted by RRFF will be made by the Friday of the second week following the week of delivery, unless otherwise specified in this Agreement.  In the event any portion of RRFF's Crop, that meets the aforementioned quality standards, is not harvested solely because there is a lack of market demand, RRFF and Grower will, on a timely basis, mutually agree upon the unharvested weight for which RRFF will pay Grower at the contracted rate per pound. In a Joint Venture deal, in the case of a walkby, RRFF will pay the Grower up to RRFF's share of the growing cost only.

Subject to the satisfaction of the conditions set forth in Section 8 of this Agreement, RRFF shall make prepayments to Grower for RRFF's share of the growing costs as specified in **Exhibit A(s)**. Grower agrees that the last prepayment indicated in **Exhibit A(s)** above may be adjusted to reflect any variances in the acreage actually planted.

Grower agrees that the prepayments set forth above are intended to support the production of only RRFF's Crop and for no other use, and Grower agrees to so use these funds.

From the date of this Agreement, RRFF shall have, and Grower hereby grants RRFF a security interest in the Crop covered by this Agreement (whether growing or to be grown),

PRIDE OF SAN JUAN MASTER.doc

o/d  version

April 14, 2000

signed

River Ranch Fresh Foods                                      Master No:10016
                                                             POSJ

and the proceeds (including insurance and condemnation proceeds) and products of the Crop,
securing RRFF's rights under this Agreement, including, without limitation, RRFF's rights to
RRFF's Crop and to reimbursement of RRFF's prepayments for the Crop and any advances
otherwise made by RRFF to Grower.  RRFF may file with the appropriate governmental
agencies and third parties, and Grower agrees to cooperate in RRFF's filing, any
documentation that RRFF deems necessary to perfect and protect its security interest,
including, without limitation, UCC financing statements and assignments of proceeds derived
by any third parties from the sale of the Crop.

**3. CONSIDERATION FOR GROWER'S CROP**  RRFF shall remit to Grower, payment of
the Net Proceeds of Sales received from the sales of Grower's Crop according to Section 13 of
this Agreement.  In a Joint Venture deal, all proceeds will be paid in to the deal and
distributed to Grower and RRFF according to their ascribed percentages.

**4. DISTRIBUTION OF CROP AND PROCEEDS**  It is acknowledged and agreed that to
achieve the best possible yields and returns from the Crop, the production harvested from
Grower's Crop and from RRFF's Crop may be commingled for harvesting, handling, selling
and shipping.  Nonetheless, it is the intent of the parties that Grower shall be paid for
Grower's Crop as if no such commingling had occurred and it had been marketed separately
from RRFF's crop on the open market at open  market prices.  To accomplish this, all of
Grower's Crop harvested will be deemed to have been sold at the price set by the weekly
pricing pools (as defined in Section 13 F.  of this Agreement), notwithstanding that some of
the units of Grower's Crop may be sold to either RRFF's processing facilities (or other
processing facilities affiliated with RRFF) or to customers for field packed product at prices
set by contracts (for a term greater than one month) between RRFF and such facilities or
customers which may be above or below then current open market prices.  Grower shall be
entitled to the Net Proceeds of Sales attributable to Grower's Crop, which amount shall be
computed as set forth in this Agreement.  It is agreed that for purposes of the above, a
standard field packed unit for each Crop shall be designated in  **Exhibit A(s)**.

**5A. FARMING**  Grower shall be responsible for growing the Crop to maturity and readiness
for harvest, and for maintaining the Crop through harvest, all in a good farmer-like manner
consistent with the best farming practices of the local area, and for preparing all headlands,
tail ditches and roadways for harvest, all at Grower's sole expense.  Grower shall provide
RRFF with copies of its planting schedules, and with weekly updates thereto, showing the
Crop actually planted and the location thereof.  Grower will promptly notify RRFF of any
situation that will (or might reasonably) result in an inability of Grower to comply with its
planting schedules, or which may affect the Crop, its quality or marketability.

Notwithstanding any other provision of this Agreement, if RRFF determines that Grower has
failed to grow the Crop, failed to pay its expenses incurred in production of the Crop, failed to
pay its debts, or otherwise failed to perform its obligations under this Agreement, then RRFF
shall have the right, but not the obligation, to enter the fields and perform the growing
functions (either directly or through third parties), and/or pay or make advances to Grower for
the expenses incurred in the production of the Crop.  All of RRFF's costs in exercising its
rights under this section shall be the sole responsibility of Grower.  RRFF may recover such

PRIDE OF SAN JUAN MASTER.doc                                 April 14, 2000

costs by deducting them from any amounts due by RRFF to Grower pursuant to this
Agreement, or it may bill Grower for such costs, in which case the amount will be due and
payable within thirty (30) days of the date of invoice.

**5B STAND**  In directly seeded plantings, at the option of RRFF, to be exercised before each
field of the Crop is thinned, any field upon which a viable stand of at least 85% after proper
thinning can not be achieved may be stricken from this Agreement. In transplant plantings,
RRFF shall have the same option, to be exercised within two weeks after transplanting, if a
viable stand of at least 85% is not achieved. In either of such events, all terms of this
Agreement relating to acreage and payments shall be adjusted accordingly for the acreage so
stricken. In no event shall such action affect the relationships between the parties as set forth
in this Agreement as to any other fields. For purposes of this section, that number of plants
per unit of square measurement which would be present if there were a viable plant every
position at standard industry spacing shall be deemed to constitute a 100% stand.

**5C GROWING COST ADJUSTMENT** If due to extraordinary circumstances the overall
average growing cost per acre increase or decrease, then after negotiation between
representatives of both parties, RRFF shall pay Grower the agreed equitable amount if the
overall average growing cost increase or Grower shall pay RRFF the agreed equitable amount
if the overall average growing cost decrease.

**6. HARVESTING OF THE CROP**  The party responsible for harvesting the Crop and
hauling it to the cooler designated by RRFF shall be specified in **Exhibit A(s)**.  The party
responsible for harvest agrees that said services shall be performed in a manner consistent
with the best practices and workmanship standards of the business.

**7. COOLING**  The party responsible for cooling the Crop and for all expenses associated
therewith is specified in **Exhibit A(s)**. RRFF shall collect from its customers appropriate
charges for cooling and associated services therewith, and shall retain the same for its own
account. RRFF agrees that its charges for cooling, associated services, and cooler rebate shall
be specified in **Exhibit A(s)**.  Grower agrees that the cooler rebate may be reduced pursuant
to the provisions of Section 13 I. of this Agreement.  Cooler rebates due Grower shall be paid
on the same schedule as the Net Proceeds of Sale.

**8. GROWER WARRANTY**  Grower represents and warrants that it has the legal right to
farm the lands upon which the Crop is growing or to be grown, and that said Crop and land
are and will continue to be free of all liens, security interests, and encumbrances securing
monetary obligations of Grower, except liens and security interests granted by Grower to the
following identified Lender(s) (if none, so state):

_____

_____

If any Lender is identified above, Grower agrees that RRFF shall have no obligation to make
any prepayments against proceeds due Grower upon delivery of the Crop, as contemplated in
Section 2 of this Agreement unless and until RRFF has received  from each Lender a Lender
Consent and Agreement in the form of Exhibit W attached hereto, appropriately completed

and executed by Grower and such Lender. In addition, the legal description(s) and/or the assessor's parcel number(s) for the property upon which the Crop is to be grown shall be set forth in Exhibit WD attached hereto as a part of this Agreement.

**9. PESTICIDES AND CHEMICAL USAGE**  Grower represents and warrants that all of the Crop produced pursuant to this Agreement will be produced using only pesticides and other chemicals which are registered under the Federal Insecticide, Fungicide and Rodenticide Act, as amended (7 U.S.C. Section 136, et seq.), and all other applicable federal, state and local regulations and laws concerning pesticides and other chemicals. Grower further warrants that the application of such pesticides and other chemicals to the Crop will be in accordance with all applicable laws. Grower further warrants that all of the Crop delivered to RRFF hereunder is guaranteed not to be adulterated within the meaning of the Federal Food, Drug and Cosmetic Act, as amended (21 U.S.C. Section 301, et seq.), or any other applicable law or regulation. Grower further warrants that the Crop shall not contain any pesticides or chemical residues prohibited by, or in excess of the tolerances established by, all applicable laws.

As a routine part of RRFF's monitoring programs, RRFF shall have the right to sample at any time any and/or all fields or lots of the Crop for the purpose of obtaining pesticide and chemical residue evaluation. Grower will immediately notify RRFF of any known or suspected violations of pesticide or chemical usage on the Crop. Upon request, Grower will provide RRFF with reports of all pesticide and chemical use for the Crop. RRFF shall not be required to purchase any of RRFF's Crop or sell any of Grower's Crop that is not in compliance with local, state and federal regulations and laws regarding pesticide and chemical applications and/or pesticide and chemical residues. Further, Grower, as the party responsible for the growing of the Crop, agrees to hold harmless and indemnify RRFF as the non-growing party, for any and all damages, losses or liabilities arising out of a failure of the Crop to be in compliance with local, state or federal regulations and laws regarding pesticide and chemical applications and/or pesticide and chemical residues.

**10. PROPRIETARY SEEDS AND LABEL PROTECTION**  Grower understands that it is a strict policy of RRFF that seeds or varieties which are the property of any other party will not be used for any crop marketed by RRFF without specific legal authority for such use. Grower warrants that the Crop is and will be in full compliance with this policy, and Grower shall indemnify, protect, and defend RRFF against any and all claims to the contrary, including, without limitation, all costs and reasonable attorney's fees.

**11. CENTRAL CALIFORNIA LETTUCE PRODUCERS COOPERATIVE**  Grower acknowledges that RRFF is an active member of the Central California Lettuce Producers Cooperative and that as such, RRFF is contractually obligated to comply with pricing, harvesting and other directives of said Cooperative established from time to time by said Cooperative to foster the intelligent and orderly marketing of agricultural products, to foster the ability of Cooperative members to obtain fair and reasonable prices, and to achieve other marketing benefits which serve the interests of all Cooperative members. Grower further acknowledges that the Crop (if covered by the Cooperative's Marketing Agreement to which RRFF is a party) will be marketed according to applicable rules and directives of said Cooperative as required by the Cooperative's Marketing Agreement. RRFF shall, upon

River Ranch Fresh Foods                                        Master No:10016
                                                               POSJ

request of Grower, provide Grower with a copy of the current Cooperative Marketing
Agreement of said Cooperative to which RRFF is a party.

**12. HARVESTING AND MARKETING OF RRFF'S CROP**  The harvesting and
marketing of RRFF's Crop shall be by any method(s) RRFF deems appropriate, in its sole
discretion.  Grower shall not be entitled to any of the proceeds of sales therefrom.

**13. TERMS RELATING SPECIFICALLY TO GROWER'S CROP**

> **A. SELLING**  RRFF shall be responsible for selling Grower's Crop in accordance
> with the terms and conditions of this Agreement.  RRFF shall be responsible for and
> apply its best efforts to marketing Grower's Crop considering crop quality and market
> conditions prevailing at the time of harvest.  In marketing Grower's Crop, RRFF, upon
> its own judgment of necessity for consummation and/or collection of sales to its best
> advantage and Grower's, may employ brokers, make adjustments or grant allowances
> to buyers, obtain applicable documentation and/or inspections from governmental
> agencies, give appropriate incentives and/or rebates to buyers, employ collection
> agents and/or undertake appropriate legal or administrative proceedings to collect
> delinquent accounts, or take any other action common in the business of marketing of
> fresh produce which is appropriate to the circumstances, and in any of such events
> may deduct from the proceeds of sale any costs it incurs therefore.  RRFF may, at its
> sole discretion, commit to price lids pursuant to customers' promotional or advertising
> campaigns for periods of one month or less, and in such event, the FOB price reported
> for computation of Net Proceeds of Sales shall be that price actually received in the
> sale.  RRFF shall not be liable for errors in judgment in exercising or declining or
> failing to exercise any of these options, or any others it has under this Agreement,
> provided it acts in good faith and performs its obligations hereunder to the best of its
> ability.  RRFF shall not be liable for losses arising from the financial failure, default or
> failure to perform of any buyer of Grower's Crop or any part of it.  Grower
> acknowledges that it is a common practice in the industry for sellers of produce to
> offer and/or grant rebates, and pay for advertisements, promotional fees and
> allowances.  Grower hereby grants permission to RRFF to offer and/or pay for such
> rebates, advertisements, promotional fees and allowances, and to deduct the costs
> thereof from the pricing pools to which they apply. Grower acknowledges that RRFF
> makes no guarantee whatever as to what prices will actually be received for Grower's
> Crop, or that the prices actually received for Grower's Crop will yield a positive return
> to Grower.

> **B. EXCLUSIVE MARKET RIGHTS**  RRFF's right to market the Crop hereunder
> shall be an exclusive right, and except as specifically set forth elsewhere herein, none
> of Grower's Crop shall be marketed by any other party at any time except upon the
> consent of RRFF obtained in advance of harvest.

> **C. SELLING FEE**  RRFF shall deduct the amounts set forth in Exhibit H(s) for all of
> Grower's Crop sold hereunder by RRFF as RRFF's fee for marketing services.  The

PRIDE OF SAN JUAN MASTER.doc                                   April 14, 2000

deduction for such services shall be made from the proceeds of sale actually received in accordance with Section 13 G. of this Agreement.

**D. AFFILIATED ENTITIES**  Grower acknowledges that (a) the processing entity commonly known as "Fresh Valley Produce," which is owned by River Ranch Fresh Foods, Inc. ("RRFF"), is affiliated with RRFF by common ownership and control and that it is the foregoing entity that performs RRFF's pre-cut vegetable processing operations, (b) that export sales are performed for RRFF by Fresh Western International, Inc., which is affiliated with RRFF by common ownership and control, and (c) that some sales by RRFF are made through other companies which are owned or controlled by RRFF, all of which are affiliated with RRFF by common ownership and control.  Grower understands and agrees that RRFF may sell and/or transfer parts or all of Grower's Crop to said "Fresh Valley Produce" for processing, or to said Fresh Western International, Inc. for export, or to other companies affiliated with RRFF, as if any of these entities were a separate third party entity not associated with RRFF and that such sales will be accounted for in the weekly pricing pool in accordance with the provisions of Sections 13 F. or 13 J. (for export sales) of this Agreement.

**E. FREIGHT**  RRFF shall pay for all costs of any after-sale freight and other delivery services associated with delivering Grower's Crop to its customers, including, without limitation, freight, transportation administrative services, temperature recorders and other services, and except where otherwise specified in this Agreement, shall receive for its own account exclusively, without obligation to report to Grower thereon, any amounts received from buyers of Grower's Crop for such freight and other delivery services.

**F. PRICING POOLS**   RRFF shall place all of Grower's Crop into weekly (Monday through Sunday) pricing pools, according to the week of shipment, with the same crop of other growers harvested in the same area and into the same and other labels for which the pack, product quality and packing standards are essentially the same.  The price recorded for each product in such pool shall be the open market price actually received, or the fair equivalent thereof for bulk or non-standard packs, provided however, that any bulk or field packed carton in any pool which is sold on a fixed price contract with a customer which is for a term greater than one month in length, whether such fixed contracted price is higher or lower than the open market price, shall be entered into the pool at the open market price or the fair equivalent thereof, as will any transfers of product by RRFF to an affiliated entity for processing.  The average of all prices in any pool shall be applied, for purposes of settlement with the Grower on Grower's Crop, to each unit in the pool.  In the event there are no sales recorded to a pricing pool and a price is needed from that pool for any computation under this Agreement, then the average mostly market price reported by the Federal-State Market News Service for the like product over all the days in the pool week involved shall be used.

**G. "NET PROCEEDS OF SALE"**  The term "Net Proceeds of Sale" as used in this Agreement shall mean that amount derived from the FOB price actually received,

River Ranch Fresh Foods                                    Master No:10016
                                                            POSJ

which shall be determined by the pooling process described in Section 13 F. of this
Agreement, plus all other revenues or receipts specifically agreed to be added to the
proceeds of sale according to this Agreement, less all costs, charges or assessments
specifically agreed to be deducted from the proceeds of sale according to this
Agreement, or to be retained by RRFF pursuant to the provisions of this Agreement,
and less any trade, industry or governmental assessments due on the sale of Grower's
Crop (which RRFF shall account for and remit as required by the applicable
authority).

**H. RECORDS, REPORTING**  Unless otherwise specifically identified, the Section
references in this Section 13 H. of this Agreement are to the California Food and
Agricultural Code.  As applicable and appropriate for the specific terms and
conditions of the Agreement, RRFF shall make all collections of and receive all
payments for the sale of the Grower's Crop, shall maintain proper records and
accounts thereof, and shall render to Grower periodic progress reports and a final
settlement report thereof in a timely manner.  RRFF and Grower agree that the reports
to Grower shall not show any amounts retained by RRFF for cooling and associated
services described in Section 7 of this Agreement or Section 13 E. of this Agreement.
Grower acknowledges that it has been provided with the form of periodic progress
report that will be rendered by RRFF to Grower, and Grower acknowledges that such
form of periodic progress report provides all necessary information required under
Sections 56273 and 56273.1(a).  Unless Grower takes exception to any periodic
progress report or final settlement report within 30 days following its issuance, the
content thereof shall be conclusive and binding on both parties.  Grower understands
that any sales as to which full proceeds have not been received as of the date of any
periodic progress report are subject to change in subsequent reports.  RRFF agrees that
all books of accounts and records relating to the preparation for market and sale of
Grower's Crops under this Agreement shall, during business hours and for a period of
not exceeding two years following any transaction, be open to inspection by Grower.
RRFF shall not be obligated to keep or to retain any of its records for a period of more
than two years following the consummation of a given transaction hereunder.

Unless Grower subsequently provides RRFF with a written notice otherwise, Grower
hereby waives any requirements for or rights to (1) affixing lot identification to
individual farm product containers as provided in subsection (h) of Section 56271, (2)
inspections on any part of the Crop alleged to be of substandard condition as provided
in Section 56280, and (3) notification of any downward price adjustment or reduction
in quantity of farm products delivered and the reasons for such adjustment as provided
in Section 56281.  Grower acknowledges that it has been advised by RRFF that it may
obtain a form from RRFF to exercise the options set forth in Section 56281. Grower
acknowledges receipt of copies of  Sections 56271, 56272, 56273, 56273.1, 56278,
56280, 56281, 56282, 56283, and 56351, which are attached hereto as Exhibit CC and
incorporated herein by reference.  Grower acknowledges and agrees that by virtue of
the various provisions in this Agreement it has waived its rights to the terms set forth
in Sections 56271, 56273, 56273.1, 56278, 56280, 56281, and 56283 and 56351, the

exact language of which is attached hereto in Exhibit CC and incorporated herein by reference.

**I.RED INK**  If Grower's Net Proceeds of Sales from any weekly pricing pool in which Grower's Crop is involved are less than zero (based on the FOB price listed in the first report for said weekly pricing pool, prior to any customer adjustments), Grower shall not be liable to RRFF for any such negative amount in that weekly pool in excess of the cooler rebate set forth in Section 7 of this Agreement, except that RRFF reserves the right to charge Grower for its fair share of any negative amount, on a shipment by shipment basis, when the cause thereof is attributable to quality problems relating to Grower's Crop which (1) are not the fault of RRFF (2) are substantiated by an inspection report from a government agency, or other independent third party, if such a report can be obtained practically, and (3) RRFF is unable to recover the negative amount from any responsible third party.  RRFF shall be the sole judge of crop quality and market conditions, and shall have the right to discontinue harvesting or selling Grower's Crop at any time it judges said conditions to be unfavorable, provided it notifies Grower and releases to Grower, in a timely manner, that portion of Grower's Crop it has decided not to harvest or sell.  Any portion of Grower's Crop so released to Grower may be disposed of or marketed as the Grower deems appropriate, and all proceeds derived therefrom shall belong to Grower, except for any amounts due hereunder to RRFF for unpaid advances.  If RRFF decides not to harvest or sell any portion of Grower's Crop because of quality or market conditions, this Agreement shall not be effected as to any other portion of the Crop.

**J. EXPORT**  Grower understands and agrees that RRFF may, at its sole option, sell any part or all of Grower's Crop into international trade, and with respect to such sales, the selling price credited for determining the Net Proceeds of Sales due Grower shall in no event be less than the then current domestic U.S. price of the comparable domestic product (as determined by the weekly pricing pool), except as specifically agreed between the parties on a case by case basis in advance of harvest.  Grower agrees that RRFF may sell any exported part of Grower's Crop through Fresh Western International, Inc., a firm affiliated with RRFF by common ownership and control, as more fully described in Section 13 D. of this Agreement.  As to any part of Grower's Crop exported, RRFF shall bear all sales, customer and shipping loses associated with shipment beyond U.S. borders, except for any loses arising from any breach of Grower's warranties under this Agreement.  RRFF shall be under no obligation whatever to sell any part of Grower's Crop into international trade.

**K. PAYMENT TO GROWER**  Net Proceeds of Sale due Grower for each price pooling week shall be paid to Grower by RRFF to 80% by the end of the 5th week after the applicable price pooling week, to 90% by the end of the 7th week after the applicable price pooling week, and to 100% by the end of the 9th week after the end of the applicable price pooling week.  Said payments due Grower shall be determined separately for each pooling week in which any part of Grower's Crop is shipped according to the prices derived from the applicable price pools, which may be adjusted

River Ranch Fresh Foods                                      Master No:10016
                                                             POSJ

by RRFF periodically according to variances, if any, between prices initially quoted
and prices actually received.

**14. SEPARATE ENTITIES, INSURANCE, LIABILITIES**  The parties hereto are
independent contractors, each pursuing its own business interests and activities independently
of the other.  This Agreement does not and shall not be deemed to create a partnership or any
other legal relationship between the parties other than the specific and limited relationship
described herein.  In performing its duties hereunder, each party shall direct and be
responsible for the actions or omissions of its own employees, agents and servants, and
neither shall have any right or obligation to direct the employees, agents or servants of the
other.

Each party will bear responsibility to insure that any outside contractor hired by such party
complies with the following requirements: (i) is duly licensed under the laws of the United
States and in the state and local jurisdiction where the services are being performed, (ii) is in
full compliance with the Migrant and Seasonal Agricultural Worker Protection Act, if
applicable, and all similar federal, state or local laws, (iii) is in full compliance with the
Immigration Reform and Control Act of 1986, as amended, (iv) carries Worker's
Compensation Insurance and general liability insurance, (v) provides all drinking water,
toilets and other facilities legally required for its employees, (vi) provides its crews with all
safety training and other training legally required, and (vii) posts all required legal notices.  At
the request of the other party, the party who has hired an outside contractor will provide the
other party with a copy of the outside contractor's license(s) and insurance policies or
certificates, and will have the outside contractor make available its payroll records.

Each party shall be responsible for and agrees to carry for itself all Workers' Compensation
Insurance and general liability insurance coverage as required by law or as generally deemed
appropriate in the industry for its type, scope and size of business, which with respect to
liability insurance, shall not be less than $2,000,000, and at the request of either party, shall
name the other party as an additional insured; and each party agrees to protect, defend and
indemnify the other against any injury or damage claims of any sort whatsoever arising out of
its duties or performance hereunder or its own business or the actions, errors or omissions of
its employees, agents and servants.

**15. FAILURE TO PERFORM**  Neither party hereto shall be required to perform, or be
liable to the other for failure to perform, if such nonperformance is caused by an occurrence
which the party unable to perform could not have prevented or cannot alleviate by good
business or farming practices at reasonable cost and with good faith effort.  The non-
performing party will exercise reasonable due diligence to correct any correctable cause of
non-performance and will resume performance as soon as possible. Each party shall bear its
own losses incurred through the date of termination of this Agreement which results from any
of the occurrences described in this Section 15.

**16. DISPUTES**  In the event the parties are unable to resolve any dispute arising under this
Agreement, either party, within thirty (30) days after its receipt of formal notice of dispute,
may demand that the dispute be submitted to arbitration, and the dispute shall then be

River Ranch Fresh Foods

Master:10016
POSJ

resolved by arbitration according to the commercial arbitration rules of the American Arbitration Association. The arbitrator's decision shall be final and binding on the parties. Should any dispute between the parties require any litigation in a court of law, it is agreed that the venue therefore shall be exclusively in the state or federal courts in and for Monterey County, California. The laws of the State of California shall control this Agreement, all interpretations thereof, and the resolution of any disputes arising thereunder. The prevailing party in any arbitration or other legal action shall be entitled to recover from the losing party its reasonable court or arbitration costs and its reasonable attorney's fees and expenses in such amounts as the court or the arbitrator shall determine.

**17. SUCCESSORS, ASSIGNMENT** This Agreement shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties hereto. Notwithstanding the foregoing, Grower may not assign any part of or interest in this Agreement without the written consent of RRFF.

**18. ENTIRE AGREEMENT, AMENDMENT** This Agreement contains all the terms and conditions relative to its subject content to which the parties have agreed, and there are no other terms or conditions agreed to by the parties relative thereto. No amendments to any of the terms and conditions contained herein shall be enforceable unless and until they are agreed to in a writing signed by both parties.

**19. NOTICES** All notices to be given under this Agreement by either party shall be in writing and considered delivered when mailed by certified mail, postage prepaid, or when hand delivered or telecopied, to the respective addresses as follows:

| RRFF | | GROWER |
|---|---|---|
| Pat Stafford | Farming Contact | Stephen Wyrick |
| 831-595-2260 | Car Phone | |
| Enrique Paraiso | Accounting Contact | Stephen Wyrick |
| 831-758-1390 | Office Phone | 831-623-4130 |
| 1*-800-468-5868 | Office Fax | 831-623-7870 |
| P.O. Box 5909 | Mailing Address | P.O. Box 218 |
| Salinas, CA | Mailing Address | San Juan Bautista |
| 93915-5909 | Mailing Address | CA 95045-0218 |
| | Fed Tax ID Number | |
| 583 | RRFF Vendor Number | 6066 |

River Ranch Fresh Foods

Master No:10016
POSJ

**IN WITNESS WHEREOF**, the duly authorized representatives of the parties have executed this Agreement to be effective as of the date first set forth above.

| FOR RIVER RANCH FRESH FOODS | FOR GROWER |
|---|---|
| By: *(signature)* | By: *(signature)* |
| TITLE: DIRECTOR, AG OPERATIONS | TITLE: CEO |
| DATE: 4-14-00 | DATE: 4/17/00 |
| BY: | BY: |
| TITLE:GENERAL MANAGER | TITLE: |
| DATE: | DATE: |

**EXHIBIT B**

# River Ranch Fresh Foods, LLC - Supplier Checklist

Food safety is of the utmost importance to River Ranch. We insist upon comprehensive food safety programs in place beginning in the field, all the way through processing and delivery of our products to our customers. Thank you for taking the time to thoroughly review the questions listed below. Please be aware that we will insist on verification of your answers.

## Supplier Capabilities (All areas subject to regularly scheduled and unscheduled River Ranch and or independent audits)

Check (x) appropriate response

| HACCP (Hazard Analysis & Critical Control Points): | Standard in place today | Standard will be in place by ___/___/___ | Not Applicable (NA) |
|---|---|---|---|
| A systematic approach to food safety that focuses on prevention of biological, physical and chemical risks in place. | X | | |
| Supplier must have documented Standard Operating Procedures (SOPS) and auditing systems to verify compliance | X | | |

### GAP (Good Agricultural Practices)*

| | Standard in place today | Standard will be in place by | Not Applicable (NA) |
|---|---|---|---|
| Supplier must have an effective, documented GAP auditing program for fields, harvesters, packing facilities and coolers that meet or exceed the *Guide to Minimize Microbial Hazards for Fresh Fruits and Vegetables* published by the FDA | X | | |
| *Copy of GAP documentation attached | X | | |
| Cleaning and sanitizing harvesting tools and using harvesting knives made of stainless steel and nonporous handles. On-farm prevention programs should include basic sanitation practices for all harvest containers, contact surfaces, and post harvest washing. | X | | |
| Supplier must ensure that water used in field operations and cooling is of the quality required for its intended use. | X | | |
| GAPs must be included in contracts with growers | | | X |

### GMP (Good Manufacturing Practices)

| | Standard in place today | Standard will be in place by | Not Applicable (NA) |
|---|---|---|---|
| Regulations developed by the FDA to ensure a safe and sanitary food supply are in place. | X | | |
| Supplier must have documented Standard Operating Procedures (SOPS) and auditing systems to verify compliance | X | | |

## Traceability:

| | | | |
|---|---|---|---|
| Supplier must control growing, harvesting, field and/or plant processing of products, and have ability to traceback. | X | | |

## Recall Program:

| | | | |
|---|---|---|---|
| A system that allows traceability of Supplier raw materials and ingredients to River Ranch finished product. | X | | |
| A supplier must be able to trace forward and backward within 4 hours on workdays and 8 hours outside workdays | X | | |
| Raw Product Sources outside the USA must be identified and approved by River Ranch prior to use | | | X |

## Allergens:

| | | | |
|---|---|---|---|
| Supplier must have a control plan in place, including S.O.P.'s, for handling common food allergens. | X | | |

## Pest Control Program:

| | | | |
|---|---|---|---|
| oordinated audits by pest control specialists. | X | | |

## Environmental Audit Program:

| | | | |
|---|---|---|---|
| Comprehensive audit program (for processors) coordinated by an outside lab such as Primus labs or Silliker Laboratories. Weekly audits to test for Listeria at all processing facilities. | X | | |

Designated Audit Lab: **PRIMUS LAB.**

## Temperature Management

| | | | |
|---|---|---|---|
| Cold chain management throughout processing and distribution. | X | | |
| Temperatures should be 33 - 38F degrees at pack out | X | | |
| Raw Product must be cooled within 4 hours of harvest | X | | |

## Sanitation:

| | | | |
|---|---|---|---|
| Ongoing program to ensure sanitary processing equipment and facility. River Ranch will continually evaluate strict sanitation programs and procedures to ensure clean and sanitary processing equipment and facilities including an initial evaluation and inspection of the production facilities. | X | | |

## Preventive Maintenance:

| | | | |
|---|---|---|---|
| Computerized system is in place to ensure specification compliance and food safety. | X | | |

## Third Party Audits:

| | | | |
|---|---|---|---|
| Comprehensive food safety review by recognized food company audit specialist (AIB/Primus Labs, etc.) is in place. | X | | |

**Designated Audit Lab:** **AIB & PRIMUS LABS**

## Specification Compliance:

| | | | |
|---|---|---|---|
| Program of auditing processes to ensure compliance to River Ranch's specifications. (River Ranch product/raw materials specifications attached) | X | | |

## Supplier Partner Program:

| | | | |
|---|---|---|---|
| Ensure that our suppliers have provided ingredients and raw materials that are food safe and within River Ranch's specification. | X | | |
| Supplier must have a detailed back-up supply plan in event of a shortage during crop transitions. | X | | |

## Training:

All new and returning employees are trained and certified on:

| | | | |
|---|---|---|---|
| HACCP | X | | |
| GMP's | X | | |
| Personnel Safety | X | | |
| Food Safety | X | | |
| Job skills | X | | |

*It is important to have a documented training program (in appropriate languages) for all employees including new hires, temporary employees and contract employees. The program should provide basic food handling training, refresher training for experienced employees, and specific training for identified jobs such as sanitarians or HACCP CCP positions.*

### Warehouse & Distribution:

| | | | |
|---|---|---|---|
| Regular audits to ensure that the quality and safety of raw materials, in-process, and finished product are maintained during handling, storage, packaging and distribution. | X | | |

## Plant Security:

| | | | |
|---|---|---|---|
| Supplier must maintain professional plant security at all times. | X | | |

## Crisis Management:

| | | | |
|---|---|---|---|
| All processors are required to have a comprehensive crisis management program in place. Among other things this will ensure that a crisis management team and effective procedures are in place, should there be a need to recall defective products and ensure the coordination of information and return of defective product to protect customers from health risk. | X | | |

## Fair Labor Standards Act Compliance:

| | | | |
|---|---|---|---|
| Supplier must be in full compliance with the Federal Fair Labor Standards Act | X | | |

## Insurance:

| | ACCEPT | DECLINE |
|---|---|---|
| | **(Check X - appropriate response)** | |
| Supplier shall, at its own costs and expense, maintain comprehensive general public liability insurance*, including product liability insurance, with a company acceptable to River Ranch Fresh Foods, LLC throughout the contract period.  All policies shall name River Ranch as additional insured. | X | |
| All such insurance shall be primary and shall include a provision for a thirty (30) days notice of cancellation be given to River Ranch. | X | |
| *Coverage:  Comprehensive commercial general liability insurance, including product liability:  Minimum of $2,000,000 per occurrence. (Copy of insurance certificate to be attached to Supplier Checklist form.) | X | |

| Imdemnification: | ACCEPT | DECLINE |
|---|---|---|
| | (Check X - appropriate response) | |
| Supplier agrees to indemnify, defend and hold River Ranch Fresh Foods, LLC harmless from and against any and all claims, liabilities, damages, losses, costs and expenses, including, without limitation, costs and expenses of investigation and settlement and attorneys' fees and expenses (collectively, "Claims"), to the extent such Claims are alleged to arise from: (i) any act or omission by supplier, or its agents and/or brokers, relating to or affecting the condition, quality or character of any Product; (ii) Supplier's performance under this contractual agreement; or (iii) a breach by Supplier of any of its representations, warranties, covenants or obligations under this contractual agreement. | X | |
| River Ranch Fresh Foods, LLC agrees to indemnify, defend, and hold Supplier harmless from and against any and all Claims to the extent such Claims are alleged to arise from: (i) any act or omission by River Ranch, or its agents and/or brokers, relating to or affecting the condition, quality or character of any Product; (ii) River Ranch's performance under this contractual agreement; or (iii) a breach by River Ranch of any of its representations, warranties, covenants or obligations under this contractual agreement. | X | |

## Effective dates:

## River Ranch Fresh Foods, LLC

Representative: _____

Title: _____

Signature: _____

Date: _____

## Supplier

Representative: PETE TRENTZ _____

Title: CFO _____

Signature: _____

Date: 2/22/2006 _____